Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| In the Matter of the Search of | Case No.  22-4136mb |
|---|---|
| *(Briefly Describe the property to be searched or identify the person by name and address)* | |
| **Black VolvoXC90 SUV with Arizona License Plate Number CLS2501, Located on the Fort Apache Indian Reservation Within the District of Arizona** | |

## ELECTRONICALLY ISSUED SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of <u>Arizona</u>.

### See Attachment A (incorporated by reference herein).

The person or property to be searched, described above, is believed to conceal:

### See Attachment B (incorporated by reference herein).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____ May 24, 2022 _____.
*(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10 p.m.
☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge.

<u>Any Magistrate Judge on duty in the District of Arizona</u>.
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized (*check the appropriate box*)   ☐ for____ days (*not to exceed 30*)
☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _____

**Camille D. Bibles**
Digitally signed by Camille D. Bibles
Date: 2022.05.10 11:52:18 -07'00'
_____
*Judge's signature*

City and State:  <u>Flagstaff, Arizona</u>

<u>Honorable Camille D. Bibles, U.S. Magistrate Judge</u>
*Printed name and title*

AO 93 (Rev. 01/09) Search and Seizure Warrant (Page 2)

# RETURN

| Case No.:<br>22-4136mb | Date and Time Warrant Executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory Made in the Presence of:

Inventory of the property taken and name of any person(s) seized:

# CERTIFICATION

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:

Executing officer's signature

Printed name and title

Application for a Search Warrant

UNITED STATES DISTRICT COURT
for the
District of Arizona

| In the Matter of the Search of *(Briefly Describe the property to be searched or identify the person by name and address)* | Case No.  22-4136mb |
|---|---|

**Black VolvoXC90 SUV with Arizona License Plate Number CLS2501, Located on the Fort Apache Indian Reservation Within the District of Arizona**

## ELECTRONIC APPLICATION FOR SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property (*identify the person or describe the property to be searched and give its location*):

### As further described in Attachment A.

Located in the _____ District of __Arizona__ , there is now concealed (*identify the person or describe the property to be seized*):

The person or property to be searched, described above, is believed to conceal (identify the person or describe the property to be seized):

### As set forth in Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| Title 18 U.S.C. 1153 and 2241(c) | Aggravated Sexual Abuse of a Child |
| Title 18 U.S.C. 2251 and 2252 | Production or Possession of Child Pornography |

The application is based on these facts:

### Affidavit of FBI Special Agent Scott E . Flake is incorporated herein by reference.

- ☒ Continued on the attached sheet.
- ☐ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Anthony W. Church    ANTHONY W. CHURCH    Digitally signed by ANTHONY CHURCH Date 2022.05.09 17:00:18 -07'00'

*Applicant's Signature*

Pursuant to 28 U.S.C. 1746(2), I declare under penalty of perjury that the foregoing is true and correct:

Scott E. Flake, Special Agent – FBI
*Applicant's printed name and title*

Sworn by Telephone
Date and time issued: _____

Camille D. Bibles  Digitally signed by Camille D. Bibles Date: 2022.05.10 11:51:53 -07'00'

*Judge's signature*

City and State: __Flagstaff, Arizona__

Honorable Camille D. Bibles, U.S. Magistrate Judge

**ATTACHMENT A**

**DESCRIPTION OF THE PERSON, PROPERTY, AND ITEMS TO BE SEARCHED**

**PROPERTY**:

1.  A black Volvo XC90 SUV with Arizona tag CLS2501.

**ITEMS**:

Items to be searched include those items to be seized listed in **Attachment B**, which may be searched either on scene or later in secure environments as described in the body of the search warrant application.

## ATTACHMENT B

## LIST OF ITEMS TO BE SEARCHED FOR AND SEIZED

1.      Images of child pornography and files containing images of child pornography in any form wherever it may be stored or found including:

a.      Any computer, computer system  and related peripherals; cellular phones, personal digital assistants, tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, scanners, modems, tape drives, disk applications programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer-related operation equipment, firewalls, switches, hubs, wireless access points, gaming consoles, web cameras, uninterrupted power supplies, hardware device power supplies, tape backup drives, digital video recorders, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including JPG, GIF, TIP AVI, and MPEG), and any electronic data storage devices including, hardware, software, diskettes, backup tapes, CD-ROMS, DVD, flash memory devices, and other storage mediums; any input/output peripheral devices, including computer passwords and data security devices an computer-related documentation, and any hardware/software manuals related to or used to: visually depict child pornography; contain information pertaining to the interest in child pornography; distribute, receive, or possess child pornography;

b.      Books and magazines containing child pornography;

c.      Originals, copies, and negatives of visual depictions of child pornography; and

d.      Motion pictures, films, videos, and other recordings of visual depictions of child pornography.

2.      Information, correspondence, records, documents or other materials pertaining to the possession, receipt or distribution of child pornography, that were transmitted or received using

computer, some other facility or means of interstate or foreign commerce, common carrier, of the U.S. mail including:

      a.    Envelopes, letters and other correspondence including electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by U.S. mail or by computer, of child pornography;

      b.    Books, ledgers and records bearing on the productions, reproduction, receipt, shipment, orders, requests, trades, purchases or transactions of any kind involving the transmission through interstate or foreign commerce, including by U.S. mail or by computer of child pornography;

      c.    Records, documents, or materials, including address books, mailing lists, supplier lists, mailing address labels, and documents and records pertaining to the preparation, purchase and acquisition of names or lists of names to be used in connections with the purchase, sale, trade or transmission of child pornography, through interstate commerce including by U.S. mail or by computer;

      d.    Records, documents or materials, including address books, names and lists of names and addresses of minors visually depicted in child pornography; and

      e.    Records of Internet usage, including user names and e-mail addresses and identities assumed for the purposes of communication on the Internet to purchase, sell, trade, transmit or acquire child pornography.  These records may include ISP records, i.e., billing and subscriber records, chat room logs, e-mail messages and include electronic files in a computer and on other data storage mediums, including CDs or DVDs.

      3.    Credit card information which evidences ownership or use of the computer equipment found in the above residence, including payment for Internet access and computers or electronic media or other storage devices, disks, CD-ROMS, or similar containers for electronic evidence.

      4.    Records evidencing occupancy or ownership of the premises described above, including utility and telephone bills, mail, envelopes or addressed correspondence.

      5.    Records or other items which evidence ownership or use of computer equipment

found in the above residence, including sales receipts, bills for Internet access and handwritten notes.

6.      Any computer hard drive or other electronic media (COMPUTER), physically located at the residence or virtually connected to any computer within the residence, found to contain information otherwise called for by this warrant:

       a.      Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, and browsing history;

       b.      Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software;

       c.      Evidence of the lack of such malicious software;

       d.      Evidence of the attachment to the COMPUTER of other storage devices, disks, CD-ROMS, or similar containers for electronic evidence;

       e.      Evidence of the times the COMPUTER was used; and

       f.      Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER.

7.      Any photographs or videos of children or youths, to include Jane Does 1-5 and other possible members of basketball teams associated with Runyon Kinney Sr.

## AFFIDAVIT IN SUPPORT OF
## <u>AN APPLICATION FOR A SEARCH WARRANT</u>

Affiant, Scott E. Flake, being duly sworn, states as follows:

1.    Affiant is a Special Agent of the Federal Bureau of Investigation (FBI), and has been employed as such for more than eighteen (18) years. As a Special Agent of the FBI, Affiant is an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18 United States Code, that is, Affiant is an officer of the United States, who is authorized by law to conduct investigations of and make arrests for offenses enumerated in Title 18. Affiant is currently assigned to the FBI Phoenix Division, Pinetop-Lakeside Resident Agency, where he has been assigned for more than six (6) years. Affiant's duties include the investigation of violent crimes and crimes against children occurring on the Fort Apache Indian Reservation (FAIR) and the San Carlos Apache Indian Reservation (SCAR), both within the District of Arizona. In working for the FBI, Affiant has also participated in investigations involving child pornography by assisting in searches, interviews, and arrests. The locations and events described below are located on or took place within the boundaries of the FAIR or SCAR and within the District of Arizona. The following information regarding the sexual assaults of Jane Doe 1 **(born in 2005)** and her sister Jane Doe 2 **(born in 2006)** by a former parental figure, Runyon Wayne Kinney Sr (born in 1979, hereafter referred to as Runyon) between approximately 2009 and 2014, and of the production and possession of child pornography by Runyon, was learned by your affiant either through personal investigation and/or observation, review of reports, and/or through discussions with other law enforcement officers, agents and/or persons.

2.    The facts and circumstances of this investigation, as set forth below, establish probable cause to support a search warrant for a red iPhone (unknown model) seized from Runyon, and for a black Volvo XC90 SUV with Runyon's belongings inside. Criminal offenses involved in this investigation include CIR-Aggravated Sexual Abuse of a Child, in violation of 18 U.S.C. §§ 1153 and 2241(c), and 18 U.S.C. §§ 2251 and 2252 which criminalizes the production, possession, receipt, and distribution of child pornography. These crimes occurred within the territorial boundaries of the FAIR or SCAT. In describing events below, Affiant does not include all facts known to him, but provides facts sufficient to establish probable cause that federal crimes occurred, and that evidence related to these crimes will be found in the locations to be searched or

in/on the items to be seized and searched offsite, more specifically described in **Attachment B**. The premise or items to be searched described in this affidavit are more specifically described as a red iPhone and a black Volvo SUV.  (See **Attachment A** for further details.)

## PROBABLE CAUSE TO SEARCH PHONE AND VEHICLE

3.     On 12/17/2021, Affiant was put in contact with a police officer from the White Mountain Apache Tribe (WMAT) Police Department (PD) concerning a possible sexual assault of children. The officer reported that employees of Apache Behavioral Health Services (ABHS) called PD and reported that in a meeting with a counselor the previous day, Jane Doe 1 disclosed that her uncle, Runyon, touched her and made her do things years earlier when he was her guardian.

4.     On 01/11/2022, Jane Doe 1 and Jane Doe 2 were afforded forensic interviews. They were accompanied to the interviews by their mother, M.S.  Before and after the forensic interviews, M.S. provided information to an advocate from Childhelp and to Affiant. M.S. described that Jane Doe 1 and Jane Doe 2 were taken from her custody for about two and a half years, and put in custody of her sister, Janice, and Janice's husband Runyon. When M.S. got the girls back, they were about seven and eight years old, or eight and nine years old. When M.S. got them back, they were wetting their pants which they had not done before. M.S. described hearing about Runyon taking Jane Doe 2 out of school to his house on campus. M.S. described a forensic interview happening years earlier. M.S. indicated that her mother (now deceased), had given a laptop to another niece, Jane Doe 3 **(born in 1997)**. Runyon basically took and used the laptop. M.S. indicated that her mother saw child pornography on the laptop at one time. M.S. indicated this was more than ten years ago, that the laptop was now broken, and its location was unknown. M.S. indicated that Jane Doe 2 told a counselor that it (sexual assaults) happened to her also.  M.S. indicated that Runyon currently lived in downtown San Carlos near the fire station.

5.     During her 01/11/2022 forensic interview, after some hesitation and acknowledging it was hard to talk about, Jane Doe 1 was asked if it happened one time or more than one time. She indicated it was more than one time. Jane Doe 1 was asked to describe the first time. Jane Doe 1 described watching a movie when it was just her, Runyon, and her cousin, who she later indicated was a baby. Jane Doe 1 indicated she felt scared and uncomfortable. Runyon told her to turn around

- 2 -

and he started to touch her. After initially saying she did not remember more, with questions, Jane Doe 1 indicated it happened in the living room. She indicated she told him to leave her alone and tried to get away but he kept grabbing her. When asked what he touched her with, Jane Doe 1 said his hand. When asked what his hand was doing, Jane Doe 1 indicated he tried to put it on her private part. When asked what else his hand was doing, Jane Doe 1 indicated it was trying to hold her down. She indicated he took her pants off (later clarifying he took both pants and underwear off). When asked what next, Jane Doe 1 indicated he was touching her and turned her around. Then he tried to force himself in her. When asked about force and what part he tried to force with, she indicated it was the part he uses to go to the restroom, and specifically pee. When asked what part of her he tried to force in to, Jane Doe 1 did not immediately answer. When asked what he was saying, Jane Doe 1 indicated he told her to play with a toy and told her not to say anything. Jane Doe 1 said she knew this was not right and not okay. She said to stop and leave her alone but he wouldn't. When asked what next, Jane Doe 1 indicated that when done he told her to put her clothes back on. He walked off to the back room getting mad and said don't say anything or he was going to hit her. When asked about Runyon's clothes, Jane Doe 1 indicated he wasn't wearing clothes, though he usually wore short pants. When asked, she clarified that he had no clothes on when he forced himself on her. When asked if he did something else to her body, with questions, Jane Doe 1 indicated he touched her with his hand where she goes pee. When asked if he wanted her to do anything to him, Jane Doe 1 said no. When asked how old she was when this happened, Jane Doe 1 indicated she was maybe in kindergarten or younger. She did not remember being in school yet. When Jane Doe 1 was asked about the house where this happened she indicated the first time happened in Lonesome Dove. Jane Doe 1 also indicated it happened multiple times in Chinatown and in the school houses (clarifying later to be school housing near the JFK school in Cedar Creek). Jane Doe 1 was asked more about Runyon's hand and what it was touching. She clarified that he took off her pants and her underwear, and that his hand was touching her skin to skin. When asked about how she was feeling, Jane Doe 1 said she did not want nobody to touch her like that. When asked more about Runyon's clothing when he forced himself and what part of him was touching what part of her, Jane Doe 1 indicated his pants and underwear were off and his part where he goes pee was touching the skin of her butt. When asked how it felt, Jane Doe 1 indicated she didn't want him to touch her.

6.      Jane Doe 1 was asked about the last time something happened. Jane Doe 1 indicated it was at the school housing. He called her back to the back room. Jane Doe 1 did not want to go. She had lived with him for a while. He grabbed her arm and took her back there. Jane Doe 1 indicated her cousins came in and saw. The room was dark and he told them to get out. He locked the door and put the dresser in front of the door. Jane Doe 1 thought he'd stop but he didn't. Jane Doe 1 just felt weird and uncomfortable and wanted to leave. It was in her cousin's room at the JFK school house. The light was off and he was in his underwear. He told her to take off her clothes. She wanted to go back to the living room and he wouldn't let her. He told her to take off her clothes and get on the bed. When asked what happened next, Jane Doe 1 indicated he turned her around. When asked what happened next, Jane Doe 1 said he did what he did that first time. When asked about what body parts were involved, Jane Doe 1 said she already told the forensic interviewer. When asked if it was like the first time, Jane Doe 1 said yes. When asked how her body felt, Jane Doe 1 indicated she just wanted to leave. When asked what she was wearing, Jane Doe 1 indicated she was wearing nothing. When asked about how this time ended, Jane Doe 1 indicated he stopped and told her to put her clothes on. When asked, Jane Doe 1 confirmed skin was touching skin. When asked how her body was feeling, Jane Doe 1 indicated she was hurting, she wanted to take a shower, and felt disgusted. When asked about hurting, Jane Doe 1 indicated her legs were hurting. When asked what his name was, Jane Doe 1 said Runyon Kinney Sr. Jane Doe 1 indicated Runyon always told her that her mom did not love her and she had nowhere to go. When asked how old she was during the incident at the school, Jane Doe 1 indicated she was in second grade.

7.      When asked to tell about another time that sticks in her head, Jane Doe 1 indicated they were all the same. Jane Doe 1 indicated she did not want to come home, and when she did come home, she wanted to stay outside. Jane Doe 1 wondered where her aunt was, and how she trusted him.

8.      Jane Doe 1 was asked to tell about a time in Chinatown. Jane Doe 1 indicated that is where they lived the longest and where the most happened. When asked to tell about one time there, Jane Doe 1 indicated she was laying on her back in a back room. She was trying to kick him away and tell him to stop. She was holding her legs down. She was crying and making noise and

- 4 -

wondering where the cousins were. Jane Doe 1 wondered why they thought it was okay to leave her with him. Jane Doe 1 mentioned in Chinatown him forcing her legs apart and him trying to put his part which he uses for the restroom into where she goes pee. When asked how her body felt, Jane Doe 1 felt her body get tense and she tried to kick him away. His part for pee touched her skin where she pees.

9.     Jane Doe 1 recalled one time when she came home from school and he said he had something for her. Jane Doe 1 did not want to go in there. Jane Doe 1 went to her room to change out of her school clothes. He followed her in and told her to close her eyes. She told him no and to get out. She knew he wouldn't leave so she closed her eyes. He said to open her mouth and he would give her something. She opened her eyes and tried to go to the living room. He tried to put his "thing" in her mouth. She pushed him away and ran out. When asked if he put it in, Jane Doe 1 said no. Jane Doe 1 said he told her to close her eyes and open her mouth and he'd give her some candy. She moved back and got out. When asked if his thing touched skin, Jane Doe 1 said yes. When asked where, Jane Doe 1 said her mouth. When asked what he was doing, Jane Doe 1 said he was laughing and she ran out. When asked what his "thing" was, Jane Doe 1 indicated his part for pee. When asked how her mouth felt, Jane Doe 1 indicated she felt cheap, she didn't want to eat, and she kept spitting. When asked, Jane Doe 1 thought she was in about first or second grade.

10.     During her 01/11/2022 forensic interview, Jane Doe 2 indicated she is 15 years old and a freshman. When asked why she came today, Jane Doe 2 said because of her uncle. When asked for more, Jane Doe 2 indicated she and Jane Doe 1 lived with him as kids because their mom used to drink. Jane Doe 2 indicated they stayed with their auntie and her husband and sometimes with Jane Doe 3. When asked more about her uncle, Jane Doe 2 indicated that what he did to Jane Doe 1, he did to her too. When asked if it was one time or more than one time, Jane Doe 2 indicated it was from about kindergarten until they moved back with their mom in about third grade. When asked to identify the uncle, Jane Doe 2 said Runyon. Jane Doe 2 was asked to describe the first time. She indicated they lived in Chinatown. She thought school was about to start or maybe it was a Saturday because she did not go to school. Jane Doe 2 then said (to the interviewer) she did not want to talk about it and that she did not want him to do it. When asked what happened, Jane Doe 2 said he raped her. When asked about rape, Jane Doe 2 said he forced himself on her. When

asked for more specifics, Jane Doe 2 said she did not know how to explain it other than he raped her. When asked what he was doing, Jane Doe 2 indicated he locked the door, then he raped her in his bed. Jane Doe 2 indicated she thought he was doing it to everyone. He would go in the room and lock the door. Jane Doe 2 didn't say nothing. When asked about his clothes, Jane Doe 2 indicated he was wearing short pants and a shirt and he took [them] off. When asked about her clothes, Jane Doe 2 indicated he took them off too. When asked what he was doing when he forced her with his clothes off, and about parts of the body, Jane Doe 2 said he raped her. When asked how her body felt, Jane Doe 2 said it hurt. When asked about hurt, Jane Doe 2 motioned with her hand as if grabbing her side near her hip and indicated that hurt, that he held her in place, and that she didn't like it.

11.     Jane Doe 2 indicated she thought in about first grade they started living in teacher housing in Cedar Creek, in the JFK house by the main road. Jane Doe 2 indicated he would take her out of class. Jane Doe 2 thought that in second and third grade they were in Chinatown again. She mentioned that sometimes they would stay at his mom's house too. When asked about the places where he raped her, Jane Doe 2 indicated in Chinatown and in the school houses by JFK. When asked what parts of her body he raped, Jane Doe 2 said "this area" as she pointed to the area of her crotch. When asked what that body part was used for, Jane Doe 2 indicated it was to sit on. When asked to say the name of the part, Jane Doe 2 said she did not want to. When asked what the part was used for, Jane Doe 2 said for the bathroom and then added for "number one." When asked if she meant pee, Jane Doe 2 agreed. When asked if he did something to other body parts, Jane Doe 2 said no. When asked if he had her do something to his body, Jane Doe 2 said "uh huh." Jane Doe 2 was asked to tell about it. She indicated it was in Chinatown, she thought it was summer and her auntie was at work and Jane Doe 2 did not feel good. Jane Doe 2 indicated he wanted her to touch his private parts. Jane Doe 2 indicated everyone was outside and he was in his room. He told her to go into his room and touch his private parts. When asked what exactly he said, Jane Doe 2 did not remember. When asked what with, Jane Doe 2 indicated her hands. Jane Doe 2 indicated that sometimes he would grab her hands and put them on it because she wouldn't do it. When asked about his clothes, Jane Doe 2 indicated he didn't have clothes on. When asked, Jane Doe 2 confirmed his hands made her hands touch his skin. When asked if he made her touch his private parts with any other parts, Jane Doe 2 said no. Jane Doe 2 asked the interviewer if they

were done. She indicated she did not want to do this because it was embarrassing and she hates him and she does not want to talk about him. Jane Doe 2 indicated she does not like herself because of what he did. Jane Doe 2 indicated she did not like talking about it because she did not like doing it. Jane Doe 2 was asked if she had ever seen this happen to others or walked in, she said no. When asked if anyone had asked to take pictures of her without clothes, Jane Doe 2 indicated sometimes he would get his phone out and start recording. With questions, Jane Doe 2 described it as an old iPhone, small and grey, no case, with a brown notepad app on it. When asked, Jane Doe 2 indicated it was Runyan's. When asked if she had ever seen people naked together, Jane Doe 2 said "just him."

12.     After learning from M.S. of a possible forensic interview years earlier, Affiant located an FBI report of a forensic interview of Jane Doe 2 in 2014. In the 2014 report, it is noted that Jane Doe 2 did not disclose any sexual assault by Runyon. However, forms accompanying the report indicated that M.S. was concerned about sexual abuse because her (M.S.'s) brother-in-law (Runyon), checked Jane Doe 2 out of school for an hour or so then brought the child back. When M.S. confronted Runyon, he indicated he checked her out because she was sick, that he gave her some medicine, and that he showed her his new home before taking her back to school. M.S. reported that Runyon took Jane Doe 2 out of school about three times.

13.     On 01/20/2022, Jane Doe 4 (**born in 1998**) was interviewed by Affiant. Jane Doe 4 was asked to describe what she had been told by her cousin, Jane Doe 1. Jane Doe 4 indicated that Jane Doe 1 told her what Runyon did to her. Jane Doe 4 indicated she was shocked and did not know what to say. She just pulled Jane Doe 1 to her and let her cry and told her she did the right thing and it would get better. Jane Doe 4 told Affiant she was so angry and disturbed that she did not know what to say or do for Jane Doe 1. Jane Doe 4 felt very bad for what Jane Doe 1 had to go through. When asked about what specifically Jane Doe 1 described or what words she used, Jane Doe 4 apologized for not being able to describe things well, noting she graduated from high school in special education. Jane Doe 4 indicated she does not even like to think about what happened to the girls, and it took her a while to get it out of her mind. When asked how long ago Jane Doe 1 told her, Jane Doe 4 indicated it was recently, maybe a month or two ago. Jane Doe 4 was asked about the circumstances when Jane Doe 1 told her. Jane Doe 4 indicated that at times,

they run out of propane at their house, and so they don't have hot water and they go to M.S.'s for showers or laundry sometimes. Jane Doe 4 indicated that on one of these times, Jane Doe 1 just told her. When asked, Jane Doe 4 indicated Jane Doe 1 had told her what Runyon did, but Jane Doe 2 had not told her anything. When asked if Runyon had ever done anything to her, Jane Doe 4 said no, indicating she never lived with him, and that Runyon was probably scared of her dad.

14.     On 01/20/2022, Jane Doe 3 **(born in 1997)** was interviewed by Affiant. Jane Doe 3 was asked what she had been told about the situation. Jane Doe 3 indicated that her cousin, Jane Doe 4, was told first by Jane Doe 1 about what happened about four months ago. Jane Doe 4 had not told Jane Doe 3 about it until Jane Doe 1's mom told Jane Doe 3 about it, which was when Jane Doe 4 told about Jane Doe 1's disclosure. Jane Doe 4 said she just held Jane Doe 1. Jane Doe 3 indicated Jane Doe 1's mom told her that "he" was "doing that to them." During the interview, Jane Doe 3 indicated she lived with Janice and Runyon from about 2009 to about 2014 and that Jane Doe 1 and Jane Doe 2 lived with them for a lot of that time. Jane Doe 3 went to live with Janice and Runyon after her mom, a sister to Janice and M.S., passed away.

15.     Jane Doe 3 confirmed that M.S. told her that Runyon did that to Jane Doe 1. When Jane Doe 3 heard about it, she broke down crying and indicated she didn't even know. Jane Doe 3 indicated they shared a room with her in Chinatown. When asked, Jane Doe 3 confirmed she was speaking of Jane Doe 1 and Jane Doe 2. Jane Doe 3 mentioned getting suspended in seventh or eighth grade when they were living in Chinatown. It was only Jane Doe 3 and Runyon home. Runyon came to her in the kitchen and asked if she knew about sex or what sex is. Jane Doe 3 looked at him and said "what the heck" and walked back in her room. Jane Doe 3 thought that was pretty weird. Jane Doe 3 told of another experience while they were living in Chinatown, which she had never told anyone before. She remembered looking down the hallway and she could tell Janice was taking a shower because she could hear the water going. Jane Doe 3 indicated Runyon always walked around with no shirt and boxers. Jane Doe 3 indicated he was standing at the end of the hallway with his private "out" but not showing. Jane Doe 3 motioned that he was standing sideways and patting his belly with his hands. Jane Doe 3 could tell someone was staring at her and she looked and he was just standing there like that. Jane Doe 3 looked away and mentioned that it was "so disturbing." With questions Jane Doe 3 clarified that this was about her freshman

year living in Chinatown, and that his private was inside his boxers but sticking up, and he was just standing there like that.

16.     Jane Doe 3 indicated they had a bunk bed in their room. At times at night, Jane Doe 3 mentioned that Jane Doe 1 would just be standing by her. Jane Doe 3 would be scared. Jane Doe 3 would not hear Jane Doe 1 getting down from the loud bunk bed. Thinking about it, Jane Doe 3 thought Runyon was probably doing stuff to her then. Jane Doe 3 would tell Jane Doe 1 to lay down, and she would lay by Jane Doe 3. She would not even talk. Jane Doe 3 wondered if she was sleep walking or something.

17.     Affiant asked if there were other times like the time his private was sticking up in his boxers incident when Janice was in the shower. Jane Doe 3 mentioned him always wearing boxers and no shirt. Jane Doe 3 again mentioned the time he asked about sex in the kitchen. Jane Doe 3 mentioned times when he would be laying in his room in boxers and call her in there. He would tell her she should watch the movie with him. Jane Doe 3 remembered being about 15 then and walked out. Jane Doe 3 also mentioned that she used to watch Law and Order SVU (known to Affiant to be Law and Order Special Victims Unit). Runyon would always yell at her cousins not to watch that with her. Jane Doe 3 mentioned that now she knows why Runyon did not want Jane Doe 1 and Jane Doe 2 to watch it with her. When asked about times when Runyon may have been alone with them, Jane Doe 3 said "all the time." Jane Doe 3 also mentioned that Runyon worked as a janitor for the JFK school.

18.     Jane Doe 3 mentioned having a laptop when they were living in Lonesome Dove and her mom was still alive. Runyon took that and her iPod from her but she did not know why. Jane Doe 3 mentioned getting on Youtube after school. Jane Doe 3 remembered her mom getting mad at her and asking what she was getting on. Jane Doe 3 remembered showing her mom the Youtube song "My President is Black." They didn't say anything after that. Jane Doe 3 indicated Runyon ended up breaking her laptop. She mentioned the hinge being broken. When asked, Jane Doe 3 indicated she did not know where the laptop or iPod were but mentioned that Janice gave them to him. Jane Doe 3 indicated the laptop was when her mom was still alive and they were living in Lonesome Dove, about 2008 or 2009. Jane Doe 3 mentioned a comment that disturbed

- 9 -

her. M.S. was dating someone who Janet and Janice were trying to get mad at. M.S.'s boyfriend told Janice to shut up and "F Runyon, he watches porn."

19.     Jane Doe 3 was asked if she had ever seen Runyon watching porn or anything like that. Jane Doe 3 answered negatively and indicated she could not get on his phone or anything. When asked if she ever saw him taking pictures of family or kids, Jane Doe 3 said he was always taking videos of family events. Jane Doe 3 indicated that another cousin (Jane Doe 5) mentioned that Runyon would record them playing with toys. Jane Doe 3 indicated he always had a video camera and always had a laptop. They had one after Jane Doe 3's laptop. Jane Doe 3 indicated Runyon had a bunch of those little tapes. Jane Doe 3 also mentioned a time when Janice and Runyon would not give M.S.'s laptop, a Macbook, back. Jane Doe 3 mentioned that she always dug around in their stuff. When she found the laptop she told M.S.. M.S. came to get it, possibly with the police, and they got mad at Jane Doe 3 and told her to stop digging around in their stuff.

20.     On the evening of 01/20/2022 Jane Doe 3 sent a screen shot to Affiant from a social media account for Runyon Kinney Sr. which indicated the account was private and showed a picture of a person appearing to be in a helmet and goggles. A name, "runz1000," was on the screen shot. On 01/21/2022, Agent received a call from Jane Doe 3, who indicated Runyon's email was runyonkinney@yahoo.com.

21.     On 02/17/2022, Jane Doe 5 **(born in 2003)** was interviewed by Affiant. Jane Doe 5 indicated she is a sister to Jane Doe 4, a cousin to Jane Doe 1, Jane Doe 2, and Jane Doe 3, and niece to Janice and Runyon. Jane Doe 5 is also a cousin to Runyon's and Janice's sons. Jane Doe 5 indicated she is about two years older than Jane Doe 1 and three years older than Jane Doe 2. Jane Doe 5 indicated her sister, Jane Doe 4, was the first person Jane Doe 1 told about what happened, and that when Jane Doe 4 found out, she was not herself and was disappointed. Jane Doe 5 indicated that in the past Jane Doe 1 has told her she needed to tell her something, but to this day she has not told her. Jane Doe 5, who is now a senior, indicated that when she was an incoming freshman, she stayed with Janice and Runyon in San Carlos over the summer. Jane Doe 5 thought it was weird when she lived there because when she was sleeping, she would feel like someone was watching her. She described a time when she thought someone was standing by the door so she got up and turned on the lights and stayed up all night until morning with the lights

on. She indicated nothing happened that night. Later in the interview Jane Doe 5 indicated she stayed up till morning because they (Runyon and Janice) left for work early.

22.     Jane Doe 5 described that Jane Doe 1 was supposed to go to San Carlos for her sophomore year. She only stayed a week. After she came back, Jane Doe 5's sister asked why she did not stay. Jane Doe 5 described that while Jane Doe 1 was sleeping, she had the blanket pulled up over her head. Janice came in to check on her and make sure she was sleeping and when she touched the blanket, Jane Doe 1 said "Runyon, leave me alone." That was when Jane Doe 5's auntie got suspicious, and Jane Doe 5 thought that is why Jane Doe 1 did not stay. Jane Doe 5 wondered if Runyon had already been in there and bothered Jane Doe 1. Jane Doe 5 indicated when they were younger, Runyon would walk around the house with just his underwear and no shirt or pants. Jane Doe 5 remembered when they were little girls, she used to go visit her cousins. She remembered Jane Doe 1, as a little girl, would have no shirt on. Jane Doe 1 would say that Runyon told her to walk around with her shirt off. Jane Doe 5 thought that was not right and expected her to wear a shirt. Jane Doe 1 told her she should take her shirt off too, which she did, though it felt weird. Jane Doe 5 remembered he would make them do that. When asked, Jane Doe 5 thought they were maybe five years old at the time.

23.     Jane Doe 5 indicated he (Runyon) would always record them too. He would record them playing basketball or playing outside. She indicated he recorded with a camera and would record his boys like on Christmas morning. Jane Doe 5 indicated he recorded a lot from when they were younger. When asked about the camera, Jane Doe 5 indicated it was a little bigger than Affiant's audio recorder (which Affiant is aware is slightly larger than a deck of cards) and had a flip-out screen. Jane Doe 5 remembered when they were grown, they would watch videos of when they were younger. When asked, Jane Doe 5 thought Runyon recording them with a camera was happening when Runyon's son was maybe one or two, and his son is now 13 or 14. Jane Doe 5 indicated Runyon has a lot of videos. Jane Doe 5 indicated Runyon used to be the custodian at JFK. Jane Doe 5 remembered about in fourth grade, they (Runyon and family) used to live in a trailer by the school. Jane Doe 2 and Jane Doe 1 and Jane Doe 5 went to school there. Jane Doe 5 remembered the teachers talking about Jane Doe 2 not feeling good. Jane Doe 5 indicated the trailer was right there and Jane Doe 2 could have walked home. Jane Doe 5 remembered the

teachers making comments about Jane Doe 2 going home with Runyon taking her home alone, and thinking it was not right. He took her home and did not bring her back for a long time. Jane Doe 5 remembered Runyon and Jane Doe 2 walking home and did not think anything of it at the time. Jane Doe 5 indicated that Runyon's son, used to have a coed basketball team, with boys and girls. They used to play in tournaments in Phoenix and San Carlos and Whiteriver. Now that team is not together. Jane Doe 5 wondered if maybe Runyon did something or looked at them because now the girls play on different teams. When asked, Jane Doe 5 thought the team was together as recently as last year or the year before. Jane Doe 5 wondered if he did something weird for the girls not to come back. Jane Doe 5 wondered if maybe they didn't tell their parents, but they would if he was in prison.

24. Affiant is aware that Lonesome Dove, Chinatown, and the area of the JFK school in Cedar Creek are all areas or locations within the boundaries of the FAIR, in the District of Arizona.

25. On 12/17/2021, Affiant obtained record checks indicating Runyon Wayne Kinney, born in 1979, had a valid Arizona driver license with an address listed as 227 Medical Drive, San Carlos, Arizona.

26. During her interview with Affiant on 01/11/2022, M.S. described Runyon as being in his 40's. Affiant showed a driver license photo of Runyon Wayne Kinney, born in 1979, to M.S., who confirmed he still looked like the photo.

27. On 01/21/2022, Affiant conducted a drive by surveillance of the address associated with Runyon's Arizona driver license, 227 Medical Dr., San Carlos, Arizona. Affiant observed that the address appeared to be a single-family residence. In the driveway was a white sedan with Arizona tag CFB2989. This license plate comes back to a 2016 Nissan Altima registered to Runyon W. Kinney born in 1979. Affiant is aware that this house is located within the boundaries of the San Carlos Apache Reservation, within the District of Arizona. Affiant is also aware that this address is within about one block of a fire station. Also, on 01/21/2022, Affiant had contact with a San Carlos Apache Tribe (SCAT) Police Department (PD) officer. The officer was familiar with Runyon as having a kids traveling basketball team.

28.     Affiant obtained Runyon's Certificate of Indian Blood and determined Runyon Kinney Sr., born in 1979, is an enrolled member of the White Mountain Apache Tribe.

29.     On 04/05/2022, a federal search warrant issued in the US District Court for the District of Arizona was executed at 227 Medical Drive, San Carlos, Arizona. During the search, pursuant to the search warrant, numerous tapes, memory cards, tablets, and phones were seized. Analysis of the seized items is still pending. During the search, with Affiant present, Janice called Runyon to notify that law enforcement was there. Runyon returned to the residence, where Affiant and another Agent spoke with Runyon in an FBI trailer on the street in front of the house. Runyon, though not handcuffed and though informed he was not under arrest, was made aware of his Miranda rights. Runyon was informed of the allegations that he had sexually assaulted Jane Doe 1 and Jane Doe 2 anally, vaginally, and orally. Affiant observed that Runyon's head dropped and his shoulders slumped. When asked about sexually assaulting the girls, Runyon invoked his right to counsel and no further questions were asked about alleged offenses. Agents informed Runyon what would be taking place with the execution of the search warrant. Agents seized a red iPhone (unknown model) which was on Runyon's person, and Runyon was allowed to depart. Out of an abundance of caution, because the red iPhone was seized from Runyon in a trailer parked in the public street in front of the residence for which an authorized search warrant was obtained, the FBI has not yet searched the iPhone.

30.     On 04/08/2022, Affiant met with M.S., the mother of Jane Doe 1 and Jane Doe 2, at her home on the FAIR. M.S. pointed out a black Volvo XC90 SUV with Arizona tag CLS2501 parked next to the house. M.S. indicated the car belonged to her, but that the contents of the car belonged to Runyon and Janice. M.S. explained that about two years earlier, Runyon and Janice moved things out of their storage unit and into M.S.'s carport and Volvo. M.S. opened the door of the Volvo and Affiant observed several large storage bins in the Volvo which M.S. indicated belonged to Runyon and Janice. M.S. indicated that Runyon and Janice had since moved the belongings from the carport, but that their belongings were still in the Volvo. On 04/08/2022, Affiant obtained checks of Arizona tag CLS2501, which corresponded with a black 2004 Volvo "Xc90" registered to M.S.

31.    As noted prior, Affiant has led or participated in many investigations involving crimes against children to include participating in some investigations of persons suspected of possessing child pornography. Affiant has participated in child pornography searches in which information storage technology that is many years old has been maintained by the subject. Affiant proposes that it is reasonable to believe that a person who has produced child pornography, such as Runyon in recording sexual acts with Jane Doe 2, or has possessed child pornography, will keep copies of those images or videos, sometimes for many years, for later sexual gratification.

32.    In summary, given the facts described above, there is probable cause to believe that federal crimes have occurred in connection with sexual assaults of Jane Doe 1 and Jane Doe 2 by Runyon Wayne Kinney Sr, to include additional federal crimes of making recordings of those assaults. Further, there is probable cause to believe that evidence of those crimes is still in possession of Runyon Wayne Kinney Sr, in the form of video of the commission of those crimes. Affiant hereby requests a search warrant be issued for the red iPhone and black Volvo XC90 SUV both believed to belong to Runyon Wayne Kinney Sr, to seize any and all devices capable of storing analog or digital images or video as described in Attachments A and B.

## CHARACTERISTICS OF INDIVIDUALS INVOLVED
## IN THE DISTRIBUTION OF CHILD PORNOGRAPHY

33.    Based upon my knowledge, experience, and training in child pornography investigations, or the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals involved in the possession and distribution of child pornography.   Those who possess and distribute child pornography:

a.    May receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b.    May collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Such individuals oftentimes use these materials for their own sexual arousal

- 14 -

and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

      c.       Often possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. These individuals typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

      d.       Often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the individual's residence, to enable the collector to view the collection, which is valued highly.

      e.       May correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

      f.       Prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

## SEARCH AND SEIZURES OF COMPUTERS

      34.      Based on your Affiant's knowledge, training, and experience, and the experience of other law enforcement personnel, your Affiant knows that searches and seizures of evidence from computers commonly requires agents to seize most or all computer items (hardware, software, and instruction), to be processed later by a qualified computer expert in a laboratory or other controlled environment. The reasons why this is true are set forth below in paragraphs.

35.    Computer storage devices (such as hard disks, diskettes, tapes, laser disks, etc.) can store the equivalent of thousands of pages of information. When the user wants to conceal evidence of a crime, he or she might store it in random order with deceptive file names. This requires the searching investigators to examine all the stored data to determine whether it is included on the warrant. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site at the time the search warrant is executed.

36.    Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources and/or from a destructive code embedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

37.    To fully retrieve data from a computer system, the analyst needs all magnetic storage devices, as well as the central processing unit (CPU). In cases where the evidence consists partly of graphics files, the monitor and printer are also essential to show the nature and quality of the graphic images which the system could produce. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create or display the data (whether stored on hard drives or on external media).

38.    In addition, the computer and its storage devices, the monitor, keyboard, and modem, are all instrumentalities of the crimes of distributing and receiving child pornography within the meaning of Title 18, U.S.C., Sections 2252 and 2252A, and should be seized as such.

## SEARCH METHODOLOGY TO BE EMPLOYED

39.     The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

A.     examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

B.     searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

C.     surveying various file directories and the individual files they contain;

D.     opening files in order to determine their contents;

E.     scanning storage areas;

F.     performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in **Attachment B**; and/or

G.     performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in **Attachment B**.

## CONCLUSION

40.     Based upon the above information, Affiant believes probable cause exists that there have been one or more violations of 18 U.S.C. §§ 1153 and 2241(c), aggravated sexual abuse of a child, and 18, U.S.C., §§ 2251 and 2252, which prohibit interstate possession, receipt, distribution, and production of depictions of minors engaged in sexually explicit conduct, including by means of a computer.

41.     Further, I believe that this evidence will be found on a red iPhone and/or in a Volvo XC90, as computer equipment and peripherals, and other items listed in **Attachment B**.

**Attachments A and B** are attached to this affidavit and are incorporated by reference as if fully set forth herein.

42.      In consideration of the foregoing, your Affiant respectfully requests that this Court issue a search warrant for a red iPhone (unknown model) seized from Runyon Kinney Sr and a search warrant for a black Volvo XC 90 parked at the home of M.S. on the FAIR, authorizing the search of said phone and vehicle for the items described in **Attachment B**, and the seizure of such items for the purpose of searching and analyzing them, on-site or off-site, as set forth above.

Scott E. Flake
Special Agent
Federal Bureau of Investigation

Telephonically subscribed and sworn before me this _____ day of _____, 2022

Camille D. Bibles   Digitally signed by Camille D. Bibles
Date: 2022.05.10 11:51:16 -07'00'

CAMILLE D. BIBLES
UNITED STATES MAGISTRATE JUDGE

- 18 -

## ATTACHMENT A

## DESCRIPTION OF THE PERSON, PROPERTY, AND ITEMS TO BE SEARCHED

**PROPERTY**:

1. A black Volvo XC90 SUV with Arizona tag CLS2501.

**ITEMS**:

Items to be searched include those items to be seized listed in **Attachment B**, which may be searched either on scene or later in secure environments as described in the body of the search warrant application.

## ATTACHMENT B

## LIST OF ITEMS TO BE SEARCHED FOR AND SEIZED

1.      Images of child pornography and files containing images of child pornography in any form wherever it may be stored or found including:

      a.      Any computer, computer system  and related peripherals; cellular phones, personal digital assistants, tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, scanners, modems, tape drives, disk applications programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer-related operation equipment, firewalls, switches, hubs, wireless access points, gaming consoles, web cameras, uninterrupted power supplies, hardware device power supplies, tape backup drives, digital video recorders, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including JPG, GIF, TIP AVI, and MPEG), and any electronic data storage devices including, hardware, software, diskettes, backup tapes, CD-ROMS, DVD, flash memory devices, and other storage mediums; any input/output peripheral devices, including computer passwords and data security devices an computer-related documentation, and any hardware/software manuals related to or used to: visually depict child pornography; contain information pertaining to the interest in child pornography; distribute, receive, or possess child pornography;

      b.      Books and magazines containing child pornography;

      c.      Originals, copies, and negatives of visual depictions of child pornography; and

      d.      Motion pictures, films, videos, and other recordings of visual depictions of child pornography.

2.      Information, correspondence, records, documents or other materials pertaining to the possession, receipt or distribution of child pornography, that were transmitted or received using

- 2 -

computer, some other facility or means of interstate or foreign commerce, common carrier, of the U.S. mail including:

  a. Envelopes, letters and other correspondence including electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by U.S. mail or by computer, of child pornography;

  b. Books, ledgers and records bearing on the productions, reproduction, receipt, shipment, orders, requests, trades, purchases or transactions of any kind involving the transmission through interstate or foreign commerce, including by U.S. mail or by computer of child pornography;

  c. Records, documents, or materials, including address books, mailing lists, supplier lists, mailing address labels, and documents and records pertaining to the preparation, purchase and acquisition of names or lists of names to be used in connections with the purchase, sale, trade or transmission of child pornography, through interstate commerce including by U.S. mail or by computer;

  d. Records, documents or materials, including address books, names and lists of names and addresses of minors visually depicted in child pornography; and

  e. Records of Internet usage, including user names and e-mail addresses and identities assumed for the purposes of communication on the Internet to purchase, sell, trade, transmit or acquire child pornography.  These records may include ISP records, i.e., billing and subscriber records, chat room logs, e-mail messages and include electronic files in a computer and on other data storage mediums, including CDs or DVDs.

  3. Credit card information which evidences ownership or use of the computer equipment found in the above residence, including payment for Internet access and computers or electronic media or other storage devices, disks, CD-ROMS, or similar containers for electronic evidence.

  4. Records evidencing occupancy or ownership of the premises described above, including utility and telephone bills, mail, envelopes or addressed correspondence.

  5. Records or other items which evidence ownership or use of computer equipment

found in the above residence, including sales receipts, bills for Internet access and handwritten notes.

6.      Any computer hard drive or other electronic media (COMPUTER), physically located at the residence or virtually connected to any computer within the residence, found to contain information otherwise called for by this warrant:

a.      Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, and browsing history;

b.      Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software;

c.      Evidence of the lack of such malicious software;

d.      Evidence of the attachment to the COMPUTER of other storage devices, disks, CD-ROMS, or similar containers for electronic evidence;

e.      Evidence of the times the COMPUTER was used; and

f.      Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER.

7.      Any photographs or videos of children or youths, to include Jane Does 1-5 and other possible members of basketball teams associated with Runyon Kinney Sr.